AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.   '23 MJ00118
Gray TMobile REVVL 4+ )
Seized as FP&F No. 2023565500007201 Line Item 0002 )
IMEI- 015727008702410     ("Target Device 1") )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A-1, incorporated herein by reference.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U. S. C. § 1324 | Conspiracy to Bring in or Transport Illegal Aliens |

The application is based on these facts:
See Attached Affidavit of Acting Border Patrol Agent-Intelligence Eugene Wesley Jr, incorporated herein by reference.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Eugene Wesley Jr, Acting Border Patrol Agent-Intelligence
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
___telephone___ *(specify reliable electronic means)*.

Date: 1/11/23

*Judge's signature* William V. Gallo

City and state: San Diego, California

Hon. William V. Gallo, U.S. Magistrate Judge
*Printed name and title*

# ATTACHMENT A-1

PROPERTY TO BE SEARCHED

The following property is to be searched:

Gray TMobile REVVL 4+
Seized as FP&F No. 2023565500007201 Line Item 0002
IMEI-015727006702410
("Target Device 1")

Target Device is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

## ATTACHMENT B

## ITEMS TO BE SEIZED

Authorization to search the cellular telephones described in Attachments A-1, A-2 and A-3 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones for evidence described below. The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrants.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **December 1, 2022, through December 31, 2022**:

    a.    tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

    b.    tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate alien smuggling and transportation of smuggled aliens;

    c.    tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

    d.    tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the Target Device; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above, which are evidence of violations of Title 8, United States Code, Section 1324.

# AFFIDAVIT

I, Eugene Wesley Jr, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic devices:

> Gray TMobile REVVL 4+
> Seized as FP&F No. 2023565500007201 Line Item 0002
> IMEI-015727006702410
> **("Target Device 1")**
>
> Blue Motorola Moto E20 Black Case
> Seized as FP&F No. 2023565500007202 - Line Item 0001
> IMEI-355689864638417
> **("Target Device 2")**
>
> Blue Xiaomi Redmi Note 11 Clear case
> Seized FP&F No. 2023565500007203 - Line Item 0001
> IMEI-862541069384923
> **("Target Device 3")**

The **Target Devices**, as further described in Attachments A-1 through A-3, and to seize evidence of a crime, specifically, violations of Title 8, United States Code, Section 1324 (Conspiracy to Bring in or Transport Illegal Aliens), as further described in Attachment B.

2. **Target Device 1** was seized from Charles GRADY, after he was found to be transporting and moving two illegal aliens within the United States: Miguel Angel MEDINA-Ovalle and Alfredo SALINAS-Cruz. **Target Device 2** was seized from MEDINA. **Target Device 3** was seized from SALINAS (hereinafter collectively referred to as "**Target Devices**"). All were arrested on December 31, 2022.

3. It is believed that the **Target Devices** were used by GRADY, MEDINA and SALINAS to communicate with co-conspirators during the alien smuggling event.

1

Probable cause exists to believe that the **Target Devices** contain evidence relating to Alien Smuggling and Conspiracy to Commit Alien Smuggling in violation of Title 8, United States Code, Section 1324. The **Target Devices** are currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of the investigation into this matter. Dates and times are approximate.

## TRAINING AND EXPERIENCE

5. I have been employed by the USBP since 2019 and am currently assigned to the San Diego Sector Intelligence Unit. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for three years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

6. I am currently assigned to conduct investigations of criminal violations relating to alien smuggling. In addition, I have extensive involvement in the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United

States; and the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

7. During my tenure as a Border Patrol Agent, I have participated in the investigation of multiple cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

8. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

9. The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the

illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

10. Based upon my training, experience, and consultations with law enforcement officers experienced in human trafficking/smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

11. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones. Specifically, searches of cellular telephones may yield evidence:

   a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

   b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate alien smuggling and transportation of smuggled aliens;

   c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

   d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

   e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

   f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

12. On December 31, 2022, Border Patrol Agent (BPA) Arturo Guzman and Adrian Powell were assigned their respective duties in Campo Border Patrol Station's Area of Responsibility (AOR). The Campo Border Patrol Station's AOR includes a rural stretch of Interstate 8 between Pine Valley, California and Boulevard, California. BPA Guzman was dressed in plain clothes and wearing his vest with patches and insignia visible, and BPA Powell was dressed in full rough duty uniform with patches and insignia visible. BPA Guzman was operating in an unmarked Chevy Equinox and BPA Powell was operating in a marked Border Patrol vehicle with fully functioning lights and siren.

13. At approximately 6:45 AM, BPA Guzman was sitting at the intersection of Church Road and Old Highway 80 helping other agents locate a group of suspected illegal aliens. BPA Guzman observed a heavily tinted silver Jeep Commander traveling north on Church Road approaching his location. The Jeep waited at the stop sign for an unusual

amount of time. The Jeep then drove north on Crestwood Rd towards the entrance of Interstate 8 (I8). The Jeep began to slow down as if it was going to enter the I8 eastbound entrance but proceeded to pass the entrance and got onto the I8 westbound. BPA Guzman conducted records check on the license plate on the Jeep, California plate 99388D2. Records returned to a Chrysler and a registered owner of KLTS LLC, 4286 34th St., San Diego, California with no prior Border Patrol checkpoint crossings. The records returned did not match the vehicle BPA Guzman was following. The last associated person to the vehicle returned to a Charles GRADY with extensive criminal history and a prior alien smuggling event.

14. BPA Guzman continued to follow the Jeep from a distance on I8 west. BPA Guzman observed the Jeep begin to drive erratically, exceeding speeds of 100 miles per hour (mph) while driving in the middle of the two lanes. The Jeep was slowing down below the posted speed limit than accelerating over 100 mph repeatably for approximately 12 miles. BPA Guzman requested a marked unit respond.

15. BPA Powell responded to the area and conducted a vehicle stop on the Jeep. The Jeep yielded just west of the Pine Valley Bridge on I8 westbound. As BPAs Powell and Guzman approached the Jeep, both observed the silhouette of two individuals lying down in the third-row seating area. BPA Powell instructed the driver, later identified as Charles GRADY, to turn the Jeep off and to step out of the vehicle.

16. BPA Guzman proceeded to the rear of the vehicle and opened the rear cargo door. BPA Guzman observed two male subjects in dark, wet clothing covered in brush and shoes covered in mud. BPA Guzman in the Spanish language conducted an immigration inspection on the two subjects later identified as Miguel Angel MEDINA-Ovalle and Alfredo Cruz SALINAS. BPA Guzman conducted an immigration inspection on MEDINA and SALINAS who stated they are citizens of Mexico without proper immigration documents which would allow them to enter or remain in the United States legally.

17. At approximately 7:00 AM, BPA Guzman placed Charles GRADY, Miguel Angel MEDINA-Ovalle and Alfredo Cruz SALINAS under arrest.

18. At the time of the event, the gray TMobile REVVL 4+ ("**Target Device 1**"), was recovered from the defendant's vehicle, located in a phone mount on the dashboard. The defendant, GRADY, confirmed that the phone recovered from the vehicle was his phone. Additionally, the defendant provided written consent to search electronic devices and provided the phone passcode to unlock the device. A Blue Motorola Moto E20 in a black case ("**Target Device 2**") was located in a backpack that MEDINA identified as belonging to him. MEDINA later stated that **Target Device 2** belonged to him. Further, MEDINA provided written consent to search electronic devices and his passcode to unlock the device. A Blue Xiaomi Redmi Note 11 with a clear case ("**Target Device 3**") was located in SALINAS' jacket pocket on his person, which he later identified as belonging to him. SALINAS provided written consent to search electronic devices and his passcode to unlock the device. These devices were subsequently seized.

19. At the Campo Station GRADY was read his Miranda rights and agreed to speak with agents without an attorney present. GRADY stated that he was contacted earlier in the morning of December 31st by a childhood friend, who told him that he could make money by picking up two people and driving them to Los Angeles. GRADY stated that he had a "good feeling" that he was about to do something wrong. GRADY stated that he was going to be paid $3,000 USD for transporting the two individuals and would be paid an additional $300 USD if he drove them straight to Los Angeles without stopping in San Diego. GRADY stated that he received GPS coordinates for the pickup location from his childhood friend. GRADY stated he drove to the GPS location and two individuals ran out of the brush and jumped into his vehicle. GRADY stated that he knew they were illegal aliens. GRADY stated that he was nervous law enforcement might be following him. GRADY stated he called his childhood friend, who told him to drive fast to see if the

vehicle would follow him. GRADY stated that he drove approximately 110 miles per hour at one point.

20. Material witnesses MEDINA and SALINAS both stated that they are citizens of Mexico without the proper immigration documents which would allow them to enter or remain in the United States legally. MEDINA and SALINAS stated that they were going to pay between $8,000-$9,000 USD if successfully smuggled into the United States. MEDINAS and SALINAS stated that they were given instructions from south side smugglers to walk north until reaching State Route 94, where they would be picked up. MEDINA and SALINAS stated that they were told a gray Jeep would honk when it arrives to pick them up. SALINAS stated that he was instructed to call a number once they reached the pick-up location. MEDINA and SALINAS stated that a gray Jeep arrived, honked, and the driver gave hand signals for them to lie down in the back seat. SALINAS stated he feared for his life during his journey because of the danger he encountered. SALINAS stated he was in the vehicle between 20 to 30 minutes before Border Patrol apprehended them. SALINAS was shown photographic line up consisting of six images each, where he identified the driver, Charles GRADY.

21. Based upon my experience and training, consultation with other law enforcement officers experienced in human trafficking/smuggling investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Devices**. In light of the above facts and my experience and training, there is probable cause to believe that GRADY, MEDINA and SALINAS were using the **Target Devices** to communicate with others to further illegal entry into the United States. Based on my training and experience, it is also not unusual for individuals, such as the Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals being smuggled, such as MEDINA and SALINAS to be involved for weeks and months longer

8

than they claim. Accordingly, I request permission to search the **Target Devices** for data beginning on **December 1, 2022, through December 31, 2022.**

## METHODOLOGY

22. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

23. Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will

employ search protocols directed exclusively to the identification and extraction of data within the scope of these warrants.

24. Based on the foregoing, identifying, and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

### PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

25. Law enforcement has not previously attempted to obtain the evidence sought by these warrants. While each party provided consent to search their devices, the phone downloads were unable to be conducted at the BP station.

### CONCLUSION

26. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Devices** will yield evidence of an alien smuggling violation of Title 8, United States Code, Section 1324.

27. Because the **Target Devices** were recovered at the time of the event and were identified by GRADY, MEDINA and SALINAS as belonging to them, and were later seized, there is probable cause to believe that such evidence continues to exist on the **Target Devices**. As stated above, I believe that the appropriate date range for this search is from **December 1, 2022, through December 31, 2022.**

28. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachments A-1 through A-3, seize the item listed in Attachment B using the above-described methodology.

//
//
//
//

29. I swear the foregoing is true and correct to the best of my knowledge and belief.

*Eugene Wesley Jr*
Eugene Wesley Jr
Border Patrol Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 11th day of January 2023.

*William V. Gallo*
HON. WILLIAM V. GALLO
United States Magistrate Judge